## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LEROY JUAN FRESQUEZ,

        Petitioner,

v.                                                                            CIV No. 00-1409 JP/LFG

ERASMO BRAVO, Warden,

        Respondent.

### MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDED DISPOSITION[1]

### Findings

1.      This is a proceeding on a petition for writ of habeas corpus under 28 U.S.C. § 2254, filed October 10, 2000. [Doc. 1].  Respondent filed his Answer on December 8, 2000 [doc. 12], and requested dismissal of the petition.   On December 21, 2000, Petitioner Leroy Juan Fresquez ("Fresquez") filed a "Traverse to Defendant's Answer."  [Doc. 13.]  Fresquez was confined at the Guadalupe County Correctional Facility in Santa Rosa, New Mexico when he filed his § 2254 petition.  He has since been released and is currently serving a period of supervised parole.[2]

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2]Respondent informed the Court that with good time served, Fresquez completed his term of incarceration and was released to a term of supervised parole.  [Doc. 35.]  In response to the Court's inquiry, the Respondent further explained that Fresquez' petition is not moot because if the aggravated battery conviction were reversed and the five-year term of incarceration subtracted from the time Fresquez would have served, he would have been released 2 ½ years earlier and would have completed his period of parole by this time.  [Id., at 2.]

2.       On March 3, 1993, a Rio Arriba County jury found Fresquez guilty of second-degree murder, aggravated battery with a deadly weapon, and felon in possession of a firearm.  [Doc. 12, Ex. A.]  On July 22, 1993, the State Court entered a Judgment, Sentence, and Commitment and sentenced Fresquez to a total of 17 ½ years of imprisonment, five of which were for the aggravated battery conviction.  [Id.]

3.       Fresquez' federal habeas petition alleges that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated "as he was deprived of effective assistance of counsel, witnesses, by compulsory process, in his favor, and subjected to prosecutorial misconduct."  [Doc. 1, p. 3.]  In addition, his petition asserts that he is incorporating all issues raised to the First Judicial District Court and the New Mexico Supreme Court, in the pleadings attached to his federal petition, which include a state court habeas petition, an amended state court habeas petition, affidavits by Rosemary Vega, Jeanette Vigil, Cindy Duran, Maria Ruth Duran (signed after his trial), and some of the appellate briefs.

4.       Fresquez' briefs in support of his federal petition challenge the state court judgment and sentence entered by the First Judicial District Court in State v. Fresquez, RA 92-179, as to his conviction for aggravated battery with a deadly weapon.  He requested that the Court grant his petition and issue a writ of habeas corpus, or, alternatively that the Court hold an evidentiary hearing, so that he could introduce new evidence establishing his actual innocence of the aggravated battery conviction.  He further asserted that he could present new evidence demonstrating that his Sixth Amendment right to effective representation was violated by trial counsel, Lorenzo Atencio ("Atencio"). [Doc. 22,  Doc. 28.]

5.     In its Answer, Respondent denied all allegations contained in Fresquez' petition but conceded that all claims were exhausted in state court.  In addition, Respondent did not claim that any of Fresquez' claims were procedurally defaulted.  [Doc. 12, ¶¶ 2, 3.]

6.     On February 9, 2001, the Court appointed counsel to represent Fresquez in this proceeding and ordered the parties to brief the issues raised in Fresquez' petition, as well as to notify the Court whether an evidentiary hearing was requested as to any of those issues.  [Doc. 14.]   On March 14, 2002, Fresquez filed his opening brief.  [Doc. 22].  On March 11, 2002, Respondent filed a brief in opposition, and on March 25, 2002, Fresquez filed his reply.  [Docs. 27, 28.]

7.     After considering the parties' briefing and the record proper, the Court granted Fresquez' request for an evidentiary hearing, specific to any new evidence he had regarding the aggravated battery conviction and to his claim of ineffective assistance of counsel as it related to the aggravated battery conviction.

8.     An evidentiary hearing was held on August 22, 2002.  Fresquez was present and represented by counsel.  Counsel for Respondent New Mexico Attorney General also was present. Fresquez called three witnesses at the hearing:  Lorenzo Atencio, Fresquez trial counsel; Cindy Duran, a witness to the incident in question; and Joyce Fresquez, petitioner's wife.  After hearing the witnesses' testimony and argument by counsel, the Court granted Fresquez' request that the parties submit simultaneous briefing on the issues raised during the hearing.  The briefing was completed by early October 2002.  [Docs. 34, 35, 36.]

9.     The Court has carefully reviewed the testimony presented at the evidentiary hearing, all of the submissions of the parties and the entire record proper, including 40 cassette tapes of the state court jury trial and 6 tapes of pre-trial and post-trial proceedings.  For the reasons stated below,

the Court recommends that Fresquez' habeas petition be granted in part and denied in part, with the result that the conviction for aggravated battery be vacated and that Fresquez be released from any further terms of supervised parole relating to this conviction, unless the State retries Fresquez on the aggravated battery charge within 120 days.

### Factual History and Trial Testimony

10.     Fresquez' conviction arises out of a fatal shooting that occurred during the late evening hours of March 11, 1992, at Cindy Duran's ("Cindy") fourteenth birthday party at the Duran home in Chimayo, New Mexico.  The party took place in a small room (approximately 12 by 13 feet) where a number of people were present.  At the party, several adults were drinking beer and tequila heavily, including Fresquez and Maria Ruth Duran ("Mrs. Duran"), Cindy's mother.  Two girls, Cindy and Jeanette ("Jeanette") Vigil, who was eleven then, were present but not drinking.  Fresquez' brother, Jamie Fresquez, also was at the party, as were the Cordova brothers, Humberto and Hugo.  All three were drinking.

11.     The party lasted from about 6:30 p.m. until between 10 and 11 p.m. when the shooting occurred.  During the course of the evening, some people left and then returned to the party.  Cindy testified that she left and returned about five times and, at times was standing outside the house.  Fresquez left at some point but returned to the party with a .38 caliber handgun.  Fresquez' mobile home was located only a few yards from the Duran home.

12.     When Fresquez returned with the gun, he showed it to people at the party, and was seen loading bullets into the gun and then firing four shots inside the room.  The shots were fired into the ceiling and lodged in the beams.  After Fresquez fired the fourth shot, there is some dispute in the trial testimony as to whether each or both of the Cordova brothers stood and  moved towards

4

Fresquez or whether Fresquez turned to Humberto Cordova ("Humberto"), who was seated on a bed, and fired a shot into his head.  Most of the trial testimony was that Fresquez shot Humberto while Humberto was seated on the bed.  Humberto either fell to the bed or the floor and was carried to his brother's Blazer by Hugo and several others.  Fresquez was seen leaving the house after firing the shots and was not seen again that night.  Fresquez turned himself into the police the next day.

13.    Fresquez did not know Hugo or Humberto prior to the party, and there was very little trial testimony to confirm any motive for the shooting or any arguments between Humberto and Fresquez leading up to the shooting.  After Humberto was shot, Cindy and Nieves Flores ("Nieves"), another man at the party, drove to the liquor store to call the police because the Durans did not have a telephone.  Cindy and Nieves waited by the liquor store to guide the police to the Duran home which was difficult to locate.

14.    Hugo testified that he was taking his brother to the Espanola Hospital and that he was going about 80 miles an hour.  Jeanette's mother, Mrs. Vega, was with him initially but got out of the car to return home, because she felt Hugo was driving too "crazy."  Hugo did not know the Chimayo area well.  He passed Cindy and Nieves while they were outside the liquor store on the side of the road waiting for the police, and they followed and passed Hugo to try to help him find the way to Espanola.  After they passed Hugo, Cindy turned back and saw that Hugo lost control of his vehicle and had an accident on a curve against the guardrail.  The damage to the vehicle's passenger side, where Humberto was lying, was fairly extensive.  The ambulance arrived soon after the accident and Humberto was taken to the Espanola Hospital where he was treated for head trauma and minor scrapes.  He was then air lifted to UNMH in Albuquerque, where two days later he was pronounced brain dead.

15.     Nieves testified that after informing the police of the vehicle accident on the night of March 11, he returned with Cindy to the Duran home, and that he, Cindy and Jeanette then drove to the Espanola Hospital to see how Humberto was doing.  He testified that Cindy did not get any type of medical care, and that he did not know if Jeanette received any medical attention because she was not with him the entire time.  He left Jeanette at the hospital and assumes she got a ride with someone else.

16.     The inference the State sought to draw was that Jeanette was sitting on the bed behind Humberto when Fresquez shot Humberto and that a part of the bullet striking Humberto exited his head and nicked Jeanette in the upper right chest/shoulder area.  This possible injury to Jeanette from the shot fired at Humberto formed the basis of the charge and Fresquez' conviction of aggravated battery.

17.     Jeanette, the alleged victim, was not available at trial.  At the evidentiary hearing, the Court asked the parties to explain what efforts were made to procure Jeanette's attendance at the trial.[3]  Counsel for the State explained that they very much wanted her testimony at trial, and had attempted to track her down through using her social security number, the Internet and investigators. They believed they had found her in Fort Worth, Texas, but then could not locate her there.  Atencio also attempted to locate Jeanette through an investigator but failed.

18.     At trial, Jeanette's friend Cindy testified that Jeanette showed her a scratch on her upper right chest or shoulder an hour or more after the shooting.  Cindy also testified that Jeanette's mother, Mrs. Vega, asked Jeanette about an hour after the shooting (apparently in front of Cindy) why Jeanette appeared "sad."

---

[3]The parties were unable to locate Jeanette for purposes of testifying at the evidentiary hearing.

19.    Cindy testified at trial that she was outside the Duran house when the shooting took place.  Cindy further stated that when she heard the shots she went next door and came back with Pauline Vigil (a relative of Cindy) to see what had happened.[4]  She was asked by the State who was in the room when she went inside at that point.  She stated that her mother was crying near Humberto and that Rosemary Vega and Jeanette were there.  The following testimony is taken from Trial Tapes #11 and #12:

STATE:    What did you notice about Jeanette? [Tape 11, 37:13.]

CINDY:    She did not say it until later.

STATE:    She did not say what until later?

ATENCIO:    Objection, hearsay.

BENCH
CONFERENCE:    [State asked for "leeway" and argued that it was not offering Jeanette's out of court statement for the truth of the matter but to show its effect on the actions of the witness.  The Court asked what Cindy was going to say and the State responded that she would say something like Jeanette told Cindy she was shot which led to Jeanette showing Cindy the injury.  The State argued the statement was an excited utterance, that it happened "almost simultaneously" with the event in question, at a time of great shock and excitement, that it was self evident that it was connected to the event/shooting.  State wished to ask her a few more questions. Atencio objected and argued that the State was attempting to convict Fresquez [of aggravated battery] on hearsay and nothing more than a photo.  Atencio argued it would be prejudicial to allow this statement in when the witness was not there.  Court said it would be prejudicial if he's convicted but that did not preclude it as an "admission," and overruled Atencio's objection. Atencio also argued Jeanette's statement could not be an excited utterance because Cindy just testified that Jeanette did not tell her until later. Court allowed the State to ask a few more questions.  Objection overruled.  Parts of the bench conference argument are inaudible. Tape 11, 40:35.]

_____

[4]Cindy Duran later contradicted her trial testimony concerning whether she was in the room at the time of the shooting.  Her affidavit testimony, provided after the trial, stated that she had been inside when Fresquez fired the shots.  [Doc. 1, affidavit attached.]

. . .

STATE:        You said you talked to Jeanette later - was that outside or inside?

CINDY:        Outside.  [Tape 11, 41:15.]

[Cindy described the people in the room as looking sad.  Her mother was crying but no one else was crying.  Cindy went to call the police with Nieves.]  [Tape 11, 41:46.]

STATE:        Did you talk to Jeanette? [Tape 11, 42:39.]

CINDY:        No.

STATE:        Not first?

CINDY:        No.

ATENCIO:      Object. Leading.

STATE:        I'm trying to place it in context as to when she talked to ...
. . .

COURT:        Please do not lead.

STATE:        When did you talk to Jeanette?

ATENCIO:      Object. Assumes facts not in evidence.

COURT:        She already testified that she talked to Jeanette. Overruled.  [43:16.]
. . .

CINDY:        When everything had already happened, she told me.  When the police had gone and everything.  [Tape 11, 43:32.]

STATE:        Did she also show you what had occurred?

ATENCIO:      Objection; may we approach?

COURT:        [at the bench conference Judge Maes told Atencio that the question had not been asked yet to object to.  She advised counsel to wait until the question was asked.]

STATE:        . . . You talked to Jeanette later. . . .  What if anything did she show you?

8

CINDY:        Her, her chest?

STATE:        What if anything did you observe on her chest?

CINDY:        She had like a scratch.  [Tape 11, 44.43.]

STATE:        [The State showed Cindy Exhibit 18, one of three photos of Jeanette's "scratch," apparently taken by Agent Sides six days after the shooting and asked Cindy if the photo accurately depicted what Jeanette showed Cindy. Cindy responded affirmatively.  The State moved the admission of Ex. 18 through Cindy.  Atencio stated: "same objection."  The photo was admitted and shown to jury.]  [Tape 11; *see also* transcript prepared by Fresquez' appellate counsel, Ex. I to Answer, pp. 3-12.]

. . .

STATE:        When we left off you were back in your mom's room with your mom, Jeanette and Jeanette's mother. What did you notice about Jeanette Vigil when you came back in? [Tape 12, 19:25.]

CINDY:        She was sad.

STATE:        That's all?

CINDY:        Yes.

STATE:        How long was this after the shooting that you came back and observed her?

CINDY:        I think about an hour.

STATE:        When you say she was sad, was she upset?

CINDY:        uh. I guess.

STATE:        What was she asked?

CINDY:        huh?

STATE:        What was she asked if anything by her mother?

ATENCIO:      Objection. Hearsay.

STATE:        [State argued to Court that it should come in as going to the physical condition of a person (exception #3), excited utterance (exception #2), and

present sense exception (#1). Counsel was prepared to argue those exceptions but wished to lay a foundation first. Court allowed additional questions.]

STATE: What if anything, as you observed Jeanette when you came back and you said she was sad and upset, did her mother say to her? [Tape 12, 20:45.]

CINDY: She told her why was she sad.

STATE: And what did Jeanette say.

ATENCIO: Objection hearsay.

BENCH
CONFERENCE: Parts are inaudible. Stated argued that it was an exception to hearsay; showed present sense impression (Jeanette's) or statement describing her condition while she was observing event; excited utterance (State read rule); showed mental or physical condition. State wished to lay groundwork for these exceptions. and argued that this obviously was a shocking event since Jeanette was sitting immediately behind Humberto when he was shot. State further argued that the amount of time was not important thing. The state of the declarant . . . was important. State asserted that it was also important to realize the statement was not self serving. Jeanette had no self serving interest. It was also a statement of her physical condition. Atencio argued that the statement must be made while declarant was perceiving event or immediately after; testimony showed that it was at least an hour later; spontaneity is the word and this was not uttered until she was asked about it later. Objection is overruled. [25.07.]

STATE: We left off where I had said her mother has asked her why she felt as she did and you had started to say what Cindy [sic] had told her mom.

STATE: What did Jeannette tell her mom?

CINDY: That she had a scratch on her chest.

STATE: Caused by what?

CINDY: Right here (Counsel for State stated: "I understand - let the record reflect that Cindy points to her own upper right chest/shoulder area").

STATE: What did she say caused that?

10

| CINDY: | The bullet I guess. |
|---|---|
| STATE: | The bullet from what? |
| CINDY: | From the, from the shot, from Humberto's head. |
| STATE: | No further questions. [Tape 12, 26.43; *see also* transcript prepared by Fresquez' appellate counsel, Ex. I to Answer, pp. 3-12.] |

20.     Although Atencio cross examined Cindy, and Cindy testified further during the State's rebuttal, Atencio did not ask any questions of Cindy regarding Jeanette and/or the alleged injury to Jeanette, the timing of statements at issue, a description of what the "scratch" looked like, and/or whether Cindy had seen the scratch on Jeanette before the party.  At the evidentiary hearing, Atencio testified that he did not cross examine witnesses about Jeannette's scratch because he wished to avoid eliciting any further testimony about Jeanette.  He believed that without Jeanette's presence at the trial, the State could not convict on this charge.  [Transcript of August 22, 2002 Evidentiary Hearing, at 21, 24.]

21.     On the night of the shooting, the police began their investigation of the crime scene. FBI Agent John Sides ("Sides") was called out to the Duran home at about 10:45 p.m.  However, Sides learned of the auto accident and diverted to that area first.  He arrived at the scene of the shooting at around midnight and spent two to three hours investigating the incident that night.  Other agents and officers also were present at the crime scene that night.  Sides returned to the Duran home two days later on Friday, March 13 and the following week on March 16 or 17.  The police gathered physical evidence from the scene, including bullets in the ceiling, a bullet fragment and some live rounds found on a bed in Fresquez' mobile home.

11

22.     Agent Sides testified that about four days after the shooting, he took photographs of Jeanette's upper right chest/shoulder area where the scratch or scab appears.  Agent Sides explained that he took the photos on March 17, which actually meant the photos were taken six days after the March 11 shooting.  Exhibits 19 and 20, the other two photos of the scratch or scab on Jeanette were admitted without objection through Agent Sides.  Atencio first objected based on relevancy and then withdrew that objection.  [Tape 17.]

23.     Agent Sides also testified later at trial that he had spoken to Jeanette on March 13th and the 17th.  The following trial testimony occurs on Tape 26 [*see also* transcript prepared by Fresquez' appellate counsel, Ex. I to Answer, pp. 12-14]:

STATE:              Why did you have her display that little mark on her . . . right shoulder?

ATENCIO:         Objection. Bench Conference.

BENCH
CONFERENCE:   [Hearsay objection by Atencio who asked that Sides not be allowed to testify as to the hearsay statement by Jeanette.  He again argued that the State was trying to convict Fresquez (of aggravated battery) based only on a photo.  The States asked to be able to lay some foundation and was allowed to do so.]

STATE:              Did you see that mark on March 13? [Tape 26, 13:58.]

SIDES:             I don't recall if I did or not.

STATE:              Did you see it on the 17th?

SIDES:             Yes I did.

STATE:              That's a black and white photo.  What color was the little mark?

SIDES:             It was red and at that time it was a scab.

STATE;              You asked her to display it so you could photograph it?

SIDES:             Yes I did.

STATE:          What was Jeanette Vigil's demeanor when you started talking to her on the 17th? [23.23.]

SIDES:          Basically calm, um, somewhat nervous, but uh, not overly so.

STATE:          During the interview did her demeanor become other than calm?

SIDES:          Yes, she uh became excited and started crying.

STATE:          Did she tell you what she was crying about? [35.11.]

SIDES:          Yes she did.

STATE:          Asks if they should approach bench.  Yes.

BENCH
CONFERENCE:     [Most is inaudible.  Counsel's argument cannot be heard other than excited utterances were being discussed.  Atencio stated she was not under duress then.  Atencio's hearsay objection was sustained.  Sides did not testify about why Jeanette was crying at that time but then was allowed to do so as part of the State's rebuttal.] [Tape 26, 36.47.]

24.     After the bench conference, Sides was asked by the State if he had been able to locate Jeanette, and he responded that he had not found her.  [Tape 26, 37:00.]  The State asked why he would want to find her and whether there was an unresolved matter about which he wished to ask her.  Sides explained that he wanted to ask Jeanette if she was wearing a jacket that night and whether it was damaged because the spent bullet fragment found at the scene appeared to have a jacket snap melded to it.

25.     Atencio cross examined Sides but it was a very short examination, and he asked him no questions about Jeanette or Sides' interviews of Jeanette.  [Tape 27, 14:45 - 20:12.]  According to Atencio, he elected not to cross-examine Sides about Jeanette's scratch for strategic purposes. [Transcript of Evidentiary Hearing, at 47-48.]

26.     During rebuttal, the State re-called Cindy Duran and Agent Sides. [Tape 35 and 36.]
Cindy testified that Elena Fresquez (mother of the Defendant) came over to the Duran home the day
after the shooting, when Cindy, Jeanette, Mrs. Duran and Pauline Vigil were present.  Elena spoke
to Mrs. Duran, at which point, Cindy testified that she and Jeanette went inside the house.  [Tape 35,
38:27.]  When Sides was questioned on rebuttal by the State, he testified about this encounter Mrs.
Fresquez had with Mrs. Duran.  Again, Sides essentially was being asked why Jeanette was crying
when Sides spoke to her March 17, testimony that the Court previously had not permitted in through
Sides when asked during the State's case-in-chief.  [Tape 36, 3:46, *compare* Tape 26.]   Atencio
apparently did not object to the line of questioning on the basis that the court previously excluded this
evidence.  The salient testimony on redirect is as follows:

| | |
|---|---|
| STATE: | What was Jeanette Vigil's demeanor [on March 17] when she spoke to you about this meeting [when Elena Fresquez came over to Duran's home]? |
| SIDES: | At that point in the interview she was crying and very nervous. |
| STATE: | I propose what follows is an exception to hearsay in that it is an excited utterance. |
| BENCH CONFERENCE: | [Most of it is inaudible.  State argued that she was obviously still under duress.  Atencio argues that it was not an excited utterance.  Objection overruled.] |
| STATE: | While you were interviewing Jeanette Vigil on March 17 and she started crying and became nervous and visibly upset, what did she tell you about the meeting with Elena Fresquez. |
| SIDES: | She told us that on the next day, March 12, Elena Fresquez went over to the apartments, the duplex and threatened the people there not to say anything about the incident or they could get hurt.  [Tape 36, 4.15 *see also* transcript prepared by Fresquez' appellate counsel, Ex. I to Answer, p. 14.] |

14

## Post-Conviction Procedural History

27.     After his conviction, Fresquez retained Gary Mitchell as appellate counsel and filed an appeal.  [Ex. B to Answer.]  In the appeal, Fresquez argued that the court erred by not giving an involuntary manslaughter instruction to the jury, in failing to direct a verdict of not guilty as to the aggravated battery charge, and in denying Fresquez the right to call an expert psychologist on the issue of lack of specific intent and intoxication.  Fresquez also argued on appeal that he was denied his right to appellate due process because several of the bench conferences were inaudible.

28.     On May 4, 1993, the New Mexico Court of Appeals proposed to affirm the convictions.  [Ex. C to Answer.]  With respect to the aggravated battery argument, the Court of Appeals commented that Fresquez' possible attempt to raise a confrontation clause challenge may not have been adequately preserved at trial and that Fresquez had not detailed what evidence the State presented on this matter.  The Court of Appeals also asked Fresquez to explain why the hearsay statements by Jeanette Vigil were not admissible as excited utterances.  On December 20, 1993, Fresquez filed his opposition to this calendar notice.  [Ex. D to Answer.]  Counsel stated he was uncertain whether trial counsel clearly argued the right of confrontation during trial and described the hearsay evidence that was admitted.

29.     On January 5, 1994, the Court of Appeals issued its second calendar notice proposing summary affirmance of the convictions.  [Ex. E to Answer.]  The Court explained at length why it concluded an involuntary manslaughter instruction was not proper under the circumstances.  The Court stated that counsel had not provided sufficient details regarding the excited utterance statements that were admitted.  Fresquez did not file any opposition to the second calendar notice, and the Court affirmed Fresquez' convictions in a Memorandum Opinion, dated January 27, 1994.

15

30.     On February 14, 1994, Fresquez, through appellate counsel Mitchell, filed a petition for writ of certiorari to the New Mexico Supreme Court.  [Ex. G to Answer.]  The New Mexico Supreme Court granted the petition as to the aggravated battery conviction based on hearsay testimony and requested briefing.  [Ex. H to Answer.]  In Fresquez' opening brief, appellate counsel set forth the exact trial testimony at issue, as best as it could be transcribed from the tapes.  [Ex. I to Answer.]  Fresquez argued that he was convicted of aggravated battery based on hearsay and speculation, and that he was not allowed to face his accuser, Jeanette Vigil.  Counsel argued that no evidence was introduced at trial showing that the mark on Jeanette was caused by a bullet and he also noted that the prosecutor, at times, suggested the desired answers to witness Cindy Duran.

31.     In its response brief, the State reiterated the evidence that supported the aggravated battery conviction.  However, counsel admitted that "Cindy's powers of articulation and description were somewhat lacking."  The State also argued in its brief that "Cindy Duran testified that she observed an injury to Jeanette immediately after the shooting." [Ex. J to Answer, p. 6, *see also* p. 12.] The taped trial testimony does not support this argument.  To the contrary, there is no testimony to this effect.  With respect to the Confrontation Clause argument, the State asserted that the hearsay statements did not violate Fresquez' right to confront witnesses against him because Jeanette was unavailable and the hearsay was clothed with sufficient indicia of reliability.

32.     On August 26, 1994, after consideration of the parties' briefs, the New Mexico Supreme Court quashed the writ of certiorari.  [Ex. L to Answer.]

33.     In April 1997, Fresquez (through Attorney Mitchell) filed his first state court habeas petition.  [Ex. M to Answer; April 21, 1997 letter to Fresquez from Mitchell, attached to Doc. 1.] Counsel argued that new evidence had been discovered in the form of affidavit statements from

Jeanette Vigil (dated November 4, 1994), her mother Rosemary Vega (dated November 4, 1994), and Cindy Duran (dated July 16, 1996). [Affidavits attached to Doc. 1.] Jeanette's affidavit does not indicate whether she believed that she was or was not hit by the bullet fired at Humberto Cordova on March 11, 1992. She stated that after her mom had returned from starting towards the hospital that Jeannette noticed she (Jeanette) "had a scratch with a little bit of blood on her left upper shoulder. It felt like if an ant had bit me."

34.     Cindy stated in her affidavit that she actually had been inside at the time of the shooting and had seen the shooting but had been afraid to testify truthfully at trial. She also stated that she knew the scratch Jeanette had was there prior to the shooting and that Jeanette admitted to Cindy that it was there previously. [Doc. 1, affidavit attached.]

35.     In her later-filed affidavit, Mrs. Vega testified that when she returned to the house after initially starting towards the hospital with the Cordova brothers on March 11, Jeanette told her she had a scratch on her shoulder and that "it felt like a stingy feeling. Then we went home." Ms. Vega did not say whether she believed the scratch was caused by the shooting. [Doc. 1, affidavit attached.]

36.     For reasons that are unclear, no action was taken by the state court on Fresquez' habeas petition for several years. On March 12, 1998, Mitchell filed a request for an evidentiary hearing on the petition. [Attached as exhibit to Doc. 1.] On April 12, 1999, Fresquez, acting *pro se,* filed a motion for order to compel response to the state habeas petition. [Ex. N to Answer.] On May 24, 1999, Fresquez, again acting *pro se,* filed an amended state habeas petition, seeking to add a claim of ineffective assistance of trial counsel, for failure to investigate and interview witnesses and his

general failure to present a defense at trial, and a claim of ineffective assistance of appellate counsel. [Ex. O to Answer, p. 15, 18-19.]

37.     On July 12, 1999, Fresquez filed a Motion for Writ of Mandamus or Alternatively a Default Judgment or Appropriate Writ with respect to his state habeas petition. [Ex. P to Answer.] Fresquez argued that after repeated requests for hearings and/or movement of the case, no response was made to the best of his belief. [*See* Sept. 19, 1999 letter from Mitchell to Fresquez, attached to Doc. 1.] On July 26, 1999, the New Mexico Supreme Court denied his motion for writ. [Ex. Q to Answer.]

38.     On September 25, 2000, the First Judicial District Court denied Fresquez' state habeas petition "after a review of the pleadings." [Ex. R to Answer.] It is unknown from the record whether any response was filed by the State to Fresquez' state habeas pleadings or what caused the delay of over three years in deciding the petition. On September 27, 2000, Fresquez filed a petition for writ of certiorari, which was denied on October 18, 2000. [Ex. T to Answer.] In his October 18 petition for writ, Fresquez appeared to argue for the first time a theory of self defense as to the murder conviction. His theory at trial had been accidental shooting and/or other cause of death. Self defense was never argued at trial.

### Deference to State Court Adjudications

39.     A federal court is precluded from granting habeas relief on any claim adjudicated on the merits by the state courts, unless the proceeding resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); Smallwood v. Gibson, 191 F.3d 1257, 1264-65 (10th Cir. 1999), *cert. denied*, 531 U.S. 833, 121

S.Ct. 88 (2000). "Federal habeas courts do not sit to correct errors of fact or to relitigate state court trials. Our jurisdiction is limited to ensuring that individuals are not imprisoned in violation of the Constitution." Thompson v. Oklahoma, 202 F.3d 283 (Table, text in Westlaw), No. 98-7158, 2000 WL 14404, at *6 (10th Cir. Jan.10, 2000), cert. denied, 530 U.S. 1265, 120 S.Ct. 2725 (2000).

40.     Section 2254(d) was amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which "increase[d] the deference to be paid by the federal courts to the state court's factual findings and legal determinations." Houchin v. Zavaras, 107 F.3d 1465, 1470 (10th Cir. 1997). The Tenth Circuit Court of Appeals recently explained:

> Under § 2254(d)(1), a federal court may grant a writ of habeas corpus only if the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law, decided the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts, or unreasonably applied the governing legal principle to the facts of the petitioner's case. 'Under § 2254(d)(1)'s unreasonable application clause . . ., a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable.' 'In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.' AEDPA also requires federal courts to presume state court factual findings are correct, and places the burden on the petitioner to rebut that presumption by clear and convincing evidence.

Sallahdin v. Gibson, 275 F.3d 1211, 1221-22 (10th Cir. 2002) (relying on 28 U.S.C. § 2254(e)(1)).

41.     Here, there is no challenge by the Respondent as to whether Fresquez exhausted all of his claims in state court, with respect to the claims asserted in the federal habeas petition, incorporated from his state court habeas petition and/or contained in pleadings attached to the federal petition. Therefore, while Fresquez' federal habeas petition is not clearly pled, it may be read to include the following claims: (1) violation of the Confrontation Clause; (2) ineffective assistance of

trial counsel for failure to provide a reasonable investigation of the underlying facts supporting the aggravated battery conviction; and (3) actual innocence of aggravated battery of Jeanette Vigil and of second degree murder.[5]

### Confrontation Clause Analysis[6]

42.     It is well settled law that a federal court does not have jurisdiction to interpret whether state courts correctly applied state law, including state evidentiary rulings.  Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475 (1991); Crespin v. State, 144 F.3d 641, 646-47 n. 4 (10th Cir.), *cert. denied*, 525 U.S. 950, 119 S.Ct. 378 (1998).  A petitioner is only entitled to habeas relief when a specific constitutional right is implicated, Cummings v. Evans, 161 F.3d 610, 618 (10th Cir. 1998), *cert. denied*, 526 U.S. 1052, 119 S.Ct. 1360 (1999), or the state court's error denied him of a fundamentally fair trial guaranteed by due process.  Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871 (1984).

43.     The Confrontation Clause problem in this case is not resolved by a determination that Cindy's statements may or may not be admissible as exceptions to the hearsay rule.  "The Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth

---

[5]The Court recognizes that it appointed counsel for Fresquez to clearly brief what issues Fresquez wished to proceed on in the federal habeas petition since the petition itself was not entirely clear.  However, while the Court will address the two issues raised in counsel's briefing, the Court also elects to discuss the alleged violation of Fresquez' right to confront witnesses against him regarding the aggravated battery conviction, and to address briefly his claims related to the second degree murder conviction.  Both parties were allowed to address the confrontation clause issue during the evidentiary hearing.

[6]This Court acknowledges the New Mexico Court of Appeals' concern that the petitioner may not have properly preserved a Confrontation Clause challenge at trial.  However, while trial counsel did not specifically identify his challenge to the trial judge as one under the Confrontation Clause, he clearly argued on several occasions that the State was attempting to convict his client on the basis of photographs and hearsay testimony alone, implying that his client was not being permitted to confront the witness against him.  In addition, trial counsel filed a Motion for New Trial, dated March 15, 1993, that expressly raised an alleged violation of the Confrontation Clause.  [Trial Record, 405-06.]  In any event, Respondent does not challenge any of the claims raised in Fresquez' petition as being unexhausted.

Amendment provides:  'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'"  Ohio v. Roberts, 448 U.S. 56, 62-63, 100 S.Ct. 2531 (1980) (internal citation omitted).  "While the Confrontation Clause does not bar the admission of all hearsay, it 'reflects a preference for face-to-face confrontation at trial.'"  Paxton v. Ward, 199 F.3d 1197, 1207 (10th Cir. 2002) (internal citation omitted).  Thus, "[t]he right of confrontation generally requires that the prosecution present evidence through live testimony, giving the defendant the opportunity to cross-examine.  The purposes of the right of confrontation are to prevent conviction by affidavit, to permit cross-examination as a tool for testing the witness' statements and recollections, and to allow the jury to judge the demeanor of the witness and thereby better assess credibility."  People v. Welsh, 58 P.3d 1065, 1073-74 (Colo. App. 2002) (citing California v. Green, 399 U.S. 149, 90 S.Ct. 1930 (1970)), cert. granted Nov. 18, 2002.  See also In the Matter of Troy P, 114 N.M. 525, 529, 531, 842 P.2d 742, 746, 748 (Ct. App. 1992) ("[t]he right to cross-examination is the most important element, and the element least tolerant of infringement"); (concurring opinion) (New Mexico has long history "of recognizing the crucial importance of cross-examination to the truth-seeking function of a criminal trial.  Accordingly, these [New Mexico] cases have jealously guarded the hearsay exceptions and applied them sparingly.")  Thus, a statement may be admissible as an exception to hearsay under Rule 803 of the Federal Rules of Evidence and still be inadmissible as violative of a party's Sixth Amendment right of confrontation.

44.     The admission of hearsay statements does not violate the Confrontation Clause if the statements bear adequate indicia of reliability.  Reliability can be inferred if the evidence falls within a firmly rooted hearsay exception.  Paxton, 199 F.3d at 1207.  However, the state court's decision

to admit hearsay testimony under state law does not resolve the question of whether a habeas

petitioner's confrontational clause rights were violated.  <u>Id.</u> at 1208.

> [T]he mere fact that a state court, in admitting evidence, tucks it into
> a pigeonhole which bears the label of a time-honored hearsay
> exception cannot be entirely dispositive.  Our habeas powers are not
> so blunted that we pay obeisance to the symbols of justice at the
> expense of substance.  Thus, the state court record must show a
> sufficient factual predicate rationally to support the affixation of the
> label.

<u>Id.</u>  (*citing* <u>Puleio v. Vose</u>, 830 F.2d 1197, 1207 (1st Cir. 1987), *cert. denied*, 485 U.S. 990 (1988)).

*See also* <u>Crespin v. New Mexico</u>, 144 F.3d 641, 648 n.4 (10th Cir.) ("We are charged with examining

the [hearsay] statement in its entirety in the context of the trial record and 'in light of all the

surrounding circumstances,' to determine whether the state court's application of the legal test . . .

is constitutionally sound."), *cert. denied*, 525 U.S. 950 (1998).

    45.    Thus, in resolving a Confrontation Clause brought by a habeas petitioner, the Court

reviews the state court decision as to admissibility of the hearsay testimony "by assessing whether it

is reasonably supported by the record and whether its legal analysis is constitutionally sound."

<u>Paxton</u>, 199 F.3d at 1209.  Such an approach "is congruent with the standards of review imposed by

the AEDPA, under which we may grant habeas relief only when a state court decision on the merits

involves an unreasonable application of clearly established federal law as determined by the Supreme

Court, or is based on an unreasonable determination of the facts in light of the evidence presented in

state court."  <u>Id.</u>

    46.    The Tenth Circuit recently provided the following analysis regarding a Confrontation

Clause challenge:

> Hearsay evidence does not violate the Confrontation Clause if (1) the declarant is unavailable at trial and (2) the statement bears adequate 'indicia of reliability.'  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

 Woodward v. Williams, 263 F.3d 1135, 1139-40 (10th Cir. 2001) (internal citations omitted), *cert. denied*, 122 S.Ct. 1442 (2002).

47.     Here, the trial court permitted hearsay statements to be introduced at trial based on its conclusion that the declarant, Jeanette Vigil, was unavailable and that the statements satisfied the excited utterance exception[7] to hearsay.  The Tenth Circuit explained in Woodward that the excited utterance exception to hearsay is firmly rooted.  Id. at 1140 (*citing* White v. Illinois, 502 U.S. 346, 355 no.8 ,112 S.Ct. 736 (1992)).  Thus, reliability of the statements is inferred.  Notwithstanding the label, however, the Court must still examine the state court record to determine whether a sufficient factual predicate rationally supported the affixation of that label.

48.     The Court first examines whether the State demonstrated, as it must, the unavailability of the declarant whose statement(s) it wished to use.  *See* Welsh, 58 P.3d at 1073-74 (*citing* Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531 (1980)).  Jeanette, the victim of the alleged aggravated battery, did not testify at trial, nor was any prior, cross-examined testimony of Jeannette introduced or admitted.  Both parties state that they attempted to subpoena Jeanette before trial but could not locate her.  It appears that Fresquez' counsel never interviewed Jeanette.  FBI Agent Sides spoke to

---

[7]The State also argues that even if the statements were not admissible as excited utterances, they were admissible under the present sense impression exception to hearsay.  However, due to the many inaudible ports of bench conferences, it is difficult to determine whether the state court ever actually admitted these statements under that exception.  Nonetheless, even if the state court did so rule, the State concedes that the present sense impression is not a "firmly rooted" exception entitled to an inference of reliability.  Thus, based on the totality of circumstances, the Court finds that there was no showing of "particularized guarantees of trustworthiness" that would support admission of the statements under the present sense exception.

Jeanette on two occasions, on March 13, 1992, and on March 17, 1992, when he took the photos of her depicting a scab or scratch on her upper right chest/shoulder.  However, he testified that he could not locate her after March 17.[8]

49.    At the evidentiary hearing, the State argued that Jeanette and her mother disappeared shortly after Sides interviewed Jeanette and that despite the State's efforts, it was unable to locate Jeanette.  The State tried to track her down through the use of her Social Security number, the Internet and its investigators.[9]  [Transcript of Evidentiary Hearing, at 8-9.]  Atencio also attempted to locate Jeanette through use of family connections and an investigator but similarly failed to procure her testimony.  The Court finds that the unavailability of Jeanette during the trial has been satisfactorily established and that the government demonstrated a good faith effort to obtain Jeanette's presence as a witness.

50.    The Court next examines whether the admissibility of the hearsay testimony under the "excited utterance exception" to hearsay was "reasonably supported by the record."  The following elements of the excited utterance exception to hearsay must be satisfied before the statement is admissible: (1) there was a startling event; (2) the statement was made while the declarant was under the stress of excitement from this event; and (3) the statement related to this event.  Woodward, 263 F.3d at 1140.

_____

[8]Sides did not testify or attempt to testify that Jeanette told him, either on March 13 or 17, that the scratch she purportedly suffered on March 11, 1992 was from the shooting.  He also testified that when he first spoke to Jeanette two days after the shooting on March 13, he could not recall that Jeanette showed him the scratch then.  Thus, it might be inferred that Jeanette did not think it important to discuss the scratch with the police or perhaps did not attribute it to the shooting.  [Tape 26.]

[9]The State's explanation of its efforts to locate Jeanette are somewhat unclear as to whether those efforts were made before trial or for purposes of locating Jeanette for the evidentiary hearing, or both.

51.     The "basis for the 'excited utterance' exception . . . is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous." Idaho v. Wright, 497 U.S. 805, 820, 110 S.Ct. 3139 (1990).

52.     At trial, Cindy was permitted to provide hearsay testimony about a conversation she apparently overheard between Jeannette and her mom (Mrs. Vega) about an hour after the shooting, wherein Mrs. Vega asked why Jeanette was "sad," and Jeanette supposedly responded that she was sad about the scratch.  In very halting and uncertain testimony, Cindy testified (with prompting from the prosecutor) that she believed Jeanette told Mrs. Vega that the scratch was caused by "the bullet I guess" that struck Humberto.  (See ¶¶ 19-20  supra.)

53.     Cindy also testified, although it was far from clear, that Jeanette later showed Cindy the scratch, "after the police had gone and everything," which according to Agent Sides' testimony, might have been as late as 2 or 3 a.m. on March 12, 1992, perhaps as much as five hours after the shooting.  (See ¶¶ 18, 19, 21 supra.)

54.     Agent Sides was allowed to testify during rebuttal[10] that six days after the shooting, Jeanette was crying and appeared nervous when she told him that Fresquez' mother had come to the Duran's house and had threatened people not to speak about the shooting incident to anyone.  [Tape 36.]

---

[10]It never was clear why the state court sustained Atencio's hearsay objection as to this proposed testimony during the State's case-in-chief but then permitted it during the State's rebuttal.

55.     With respect to the statement by Jeanette that was admitted through Cindy, it is clear that the shooting constituted a startling event.  However, Cindy's equivocal response of "the bullet I guess" to the suggestive question of "what did she [Jeanette] say caused it [the scratch] does not necessarily indicate that Jeanette even made this statement, and without any cross examination by Atencio on this point, it remained unclear.  In addition, there is a lack of evidence that Jeanette was emotionally upset or excited when she supposedly made the statement to her mother or to Cindy.  Instead, Jeanette's mother asked her why she seemed <u>sad</u>.  Jeannette could have been sad for a number of reasons that evening, none of which were explored at trial.  The conversation between Jeanette and her mother apparently happened an hour or more after the shooting, rather than immediately after the event.  The statement, if made, was not spontaneously volunteered by Jeanette and not contemporaneous with her observation of the event.  *See* <u>Paxton</u>, 199 F.3d at 1210 (statement at issue was not truly spontaneous because child made it in response to mother's questions several hours after the startling event).

56.     The State has the burden of establishing the statement was sufficiently reliable to meet the constitutional standard.  That burden has not been carried.  Here, evidence that Jeanette's purported statement was spontaneous is entirely lacking.  "[T]he underlying justification for the excited utterance exception 'is that the spontaneity of the statement in relation to the exciting event gives rise to trustworthiness. . . .'" <u>Id.</u> (internal citation omitted).  "If the hearsay statements do not fall within a firmly rooted hearsay exception, 'they are presumptively unreliable and inadmissible for Confrontation Clause purposes,' and 'must be excluded, at least absent a showing of particularized guarantees of trustworthiness." <u>Id.</u> at 1211 (internal citations omitted).  Moreover, even if true that Jeanette had no reason to lie, the State fails to convince the Court that the statement was spontaneous

26

or made while in the excitement of the moment.  Indeed, there is so much hesitation and vagueness in Cindy's testimony, along with suggestive prompting from the State, that is difficult to know whether Jeanette made the statement at all.  Indeed, the impression is that Cindy was seeking to get the examiner's approval, as in a classroom situation where the tone of a response is almost a question: "did I get the answer right?"  Cindy's testimony fails to give the impression that Jeanette was excited about something or spontaneously describing what had happened to her.

57.     The Court agrees with authorities cited by the State that there is no definite or fixed limit on time in analyzing the second element of the excited utterance exception.  However, time "definitely is a factor."  In the Matter of Troy P., 114 N.M. at 529, 842 P.2d at 746.  This inquiry depends on the circumstances of each case and in particular, the state of the declarant.  Id.  One scenario that might support a finding of excited utterance includes circumstances where the declarant was "so deeply traumatized" by an event that in uttering statements about it, his or her excitement is rekindled.  Id.  In State v. Robinson, 94 N.M. 693, 697-98, 616 P.2d 406, 410-11 (1980), the court noted that it was clear that the statement was clothed in reliability where the person testifying was subjected to extensive direct and cross examination regarding the circumstances surrounding the declarant's statement.  For example, the witness described the declarant as not being herself, trembling, pale, literally shaking and never this upset before.  Id.  The excited utterance must be so inherently truthful that the ordinary sanctions and tests may be dispensed with.  State v. Maestas, 92 N.M. 135, 141, 584 P.2d 182, 188 (Ct. App. 1978).  Statements that commonly are found to be excited utterances are described as impulsive, spontaneous, and/or made under the immediate strain and influence of an exciting occurrence.  Id.  But such is not the case here.  There was very little direct examination about Jeanette's hearsay statement and no cross examination by Atencio that

27

challenged Cindy's testimony.  Based on these circumstances, there is little to convince the Court of the "inherent truthfulness" of the statement.

58.     The Court reaches similar conclusions as to Cindy's testimony concerning Jeanette's actions in showing her the scratch many hours after the shooting and Agent Sides' testimony that Jeanette told him of a threat by Fresquez' mother some six days after the shooting.  The record does not support the admission of Cindy's testimony as to Jeanette's action in showing her the scratch or in Sides' testimony regarding Jeanette's statement that may have been double hearsay.

59.     Moreover, under a totality of the circumstances, there are not sufficient particularized guarantees of trustworthiness that would render the hearsay statements to be accurate or truthful. In this case, other than the statements at issue, there was minimal evidence to support the aggravated battery conviction.  There were three photos of Jeanette's scratch on her upper right chest/shoulder that were admitted at trial, one through Cindy and two through Agent Sides.  The photos were taken six days after the shooting, although the parties consistently describe them as being taken four days after March 11.  Sides did not testify at any point that Jeanette told him the scratch was the result of the shooting.

60.     The other evidence that might support the aggravated battery conviction was testimony by some witnesses that Jeanette was seated by or behind Humberto on the bed and that a part of the bullet that exited Humberto's head was located on the ground.  However, there was no expert testimony presented to show that the scratch on Jeanette was caused by a bullet, no medical testimony indicating that to a reasonable degree of medical probability the mark or scratch was caused by a bullet or bullet fragment.  There was no forensic or scientific evidence linking the mark or scratch to the bullet fired by Fresquez and no evidence that Jeanette was treated for any injury.  The

28

Court concludes that based on a totality of the circumstances the admissibility of the hearsay statements was not supported by the record. Thus, in the face of the statements' presumptive unreliability, Paxton, 199 F.3d at 1211, the admission of the statements violated Fresquez' Sixth Amendment rights to confront his accusers.

61.     To the extent that the Court is required to perform a harmless error analysis before awarding habeas relief, the Court finds that habeas relief is proper here where the primary evidence supporting the aggravated battery conviction was improper hearsay testimony. Without the hearsay statements that attempted to link the shooting to Jeanette's scratch, there was little to support the aggravated battery conviction except several photos of a scratch that may or may not have resulted from the shooting and the location of a bullet fragment that may or may not have struck Jeanette. Thus, the Court has grave doubt as to whether the constitutional errors of admitting the hearsay statements had an unfair prejudicial effect on the jury's deliberations. See Paxton, 199 F.3d at 1219 (discussing harmless error analysis).

62.     Based on these circumstances, the Court recommends finding that the admission of the statements at issue violated Fresquez' right to confront the witness and to test the statements through cross-examination. Based on this recommendation, the Court need not address Fresquez' additional arguments that Atencio's defense to the aggravated battery charge was constitutionally

defective under <u>Strickland</u> standards[11] or Fresquez' claim of actual innocence as to the aggravated battery conviction.

<u>**Actual Innocence – Second Degree Murder Conviction**</u>

63.     In considering how claims of actual innocence fall within the scope of federal habeas relief, the Tenth Circuit stated:

> Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation **occurring in the underlying state criminal proceeding.**
> . . . .
> This rule is grounded in he principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution--not to correct errors of fact.

<u>Sellers v. Ward</u>, 135 F.3d 1333, 1339 (10th Cir.) (emphasis in original) (internal citation omitted),

*cert. denied*, 525 U.S. 1024, 119 S.Ct. 557 (1998).  For federal courts to review freestanding claims

of actual innocence would disrupt the federal judicial system.  <u>Id.</u>

> This is not to say that our habeas jurisprudence casts a blind eye toward innocence. . . . . [W]e have held that a petitioner otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. . . . .But this body of our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.

<u>Id.</u> (internal citations omitted).

---

[11]In addition, the Court declines to analyze Fresquez' claim that his appellate counsel was ineffective. Fresquez argued that appellate counsel Mitchell waited until the last day before filing the state habeas petition so that he would cause a procedural default, and that Mitchell would not enter an appearance while refusing to remove himself from the case so that the state court could rule on the issues in the habeas petition.  It does not appear that Mitchell caused a procedural default, nor is there any evidence to show that Mitchell's conduct delayed proceedings in the First Judicial District.  Thus, Fresquez did not supply any support for a claim of ineffective assistance of appellant counsel.

64.     To pass through the gateway, the petitioner must present evidence of innocence so strong that a court cannot have confidence in the outcome of the trial.  Id.  The evidence also must establish sufficient doubt about his guilt to justify the conclusion that his conviction would be a miscarriage of justice – unless the conviction was the product of a fair trial.  Id.  Ultimately to succeed with such a claim, the petitioner must show a constitutional error "'probably' resulted in the conviction of one who was actually innocent."  Id. (internal citation omitted).  In other words, he must demonstrate that it is more likely than not that no reasonable juror, upon considering the new evidence, would have convicted him.  Id. at 1338-39.

65.     The threshold showing required for actual innocence claims is extremely high.  Id. at 1339; Clayton v. Gibson, 199 F.3d 1162, 1180 (10th Cir. 1999), cert. denied, 531 U.S. 838, 121 S.Ct. 100 (2000).

66.     Fresquez claims that he was not guilty of second degree murder and that the new evidence demands that the Court have instructed the jury as to involuntary manslaughter.  He also asserts in his federal habeas petition that self defense was a viable defense, and that the appropriate charge was involuntary manslaughter at most.  [Doc. 1; state habeas petition.]

67.     The New Mexico Court of Appeals thoroughly considered Fresquez' position that the jury should have been instructed as to involuntary manslaughter and rejected this argument for reasons unrelated to the proposed new evidence.  In other words, the involuntary manslaughter instruction, according to the Court of Appeals' interpretation of the law and the facts, could not be given based on language of the statute and Fresquez' prior felony conviction.

68.     Therefore, the Court recommends finding that the state court's adjudication of the claim regarding the second degree murder conviction was not contrary to clearly established federal

31

law or an unreasonable application of clearly established federal law.  Further, the state court's denial of that claim was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, Fresquez' claim of actual innocence with respect to the second degree murder conviction and the related argument as to the involuntary manslaughter jury instruction should be dismissed.

69.     Similarly, the Court cannot find any error by the state court with respect to a claim concerning self defense since this defense was not presented during trial, nor was there any significant evidence admitted at trial to support such a defense.

### Recommended Disposition

70.     The Court recommends that Fresquez' § 2254 petition be granted as to the aggravated battery conviction, on the grounds that his rights under the Confrontation Clause were violated.  The Court does not reach Fresquez' claim that trial counsel was ineffective or that based on new evidence he was actually innocent of aggravated battery.  Thus, those claims are denied as moot.  The Court recommends that Fresquez' claims alleging ineffective assistance of appellate counsel and actual innocence as to the second degree murder conviction be dismissed, with prejudice.

71.     The result of the Court's recommendation is that Fresquez' conviction for aggravated battery be vacated and that he be released from the remainder of his term of supervised parole, unless the state retries Fresquez within 120 days.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

32